MAX OIL COMPANY, INC., Plaintiff,

Federated Mutual Insurance Company, Intervenor–Plaintiff,

v.

SHELL OIL COMPANY, Defendant.

No. CV–96–A–080–N.

United States District Court, M.D. Alabama, Northern Division.

Nov. 14, 1996.

Bibb A. Allen, Susan S. Hayes, Birmingham, AL, for Plaintiff.

Jeffrey E. Friedman, Chris J. Zulanas, Birmingham, AL, for Intervenor.

Walter T. Gilmer, Edward S. Sledge, Mobile, AL, for defendant.

### MEMORANDUM OPINION

ALBRITTON, District Judge.

## I. INTRODUCTION

This cause is before the court on defendant Shell Oil Company's ("Shell") motion for summary judgment, filed July 22, 1996; on plaintiff Max Oil Company's ("Max") cross motion for summary judgment, filed August 30, 1996; and on intervenor Federated Mutual Insurance Company's ("Federated") motion for summary judgment, filed August 30, 1996. Also filed herein were each party's briefs in support of their motions for summary judgment, each party's response briefs to the other parties' motions for summary judgment, and each party's evidentiary submissions.

The court has jurisdiction under 28 U.S.C. § 1332, by virtue of diversity of citizenship.

## A. Facts

In deciding these motions for summary judgment, the court has carefully examined all submissions by the parties.

In 1983, Shell designed an 8′ × 20′ building, and the building was constructed that year for Shell by Madison Industries. The building, referred to as a "kiosk," was intended to be used by gas station attendants. In 1985, Shell moved the kiosk from Kenner, Louisiana, to 55 South Broad Street, Mobile, Alabama. The kiosk was used from 1985 to 1991 by two different Shell independent dealers.

In 1991, Max purchased Shell's facilities at 55 South Broad Street, including the kiosk. From that date on, Shell had no ownership interest in or control over the kiosk. The 1991 Purchase Agreement between Max and Shell contained the following indemnification agreements:

11. INDEMNITY.

11.1 Indemnification of Purchaser. Shell shall defend, indemnify and hold harmless Purchaser, its directors, employees, and agents to the fullest extent permitted by law, against all claims, suits, liabilities, judgments, losses, and expenses (including attorneys' fees and costs of litigation) arising out of or in any way relating to or caused by (a) any breach of the representations or warranties made by Shell in this Agreement or in any document delivered by Shell pursuant hereto; (b) any breach by Shell of any of its covenants or obligations under this Agreement; or (c) any possession, use, operation, or maintenance of the Premises, including any improvements, fixtures, or equipment appurtenant thereto or activities conducted thereon or any environmental contamination resulting therefrom, which occurred prior to the Closing Date.

11.2 Indemnification of Shell. Purchaser shall defend, indemnify, and hold harmless Shell, its directors, employees, and agents to the fullest extent permitted by law, against all claims, suits, liabilities, judgments, losses, and expenses (including attorneys' fees and costs of litigation) arising out of or in any way relating to or caused by (a) any breach by Purchaser of

any of its obligations under this Agreement; (b) any acts of omissions of Purchaser or its agents arising out of Purchaser's exercise of its rights under this Agreement; or (c) any possession, use, operation, or maintenance of the Premises, including any improvements, fixtures, or equipment appurtenant thereto or activities conducted thereon or any environmental contamination resulting therefrom, which occurs on or subsequent to the Closing Date.

Furthermore, from 1981, up to and through the events which are the subject of this litigation, Max and Shell were parties to another agreement referred to as the Jobber Contract. As a part of the Jobber Contract, Shell agreed to serve as a jobber for Max by supplying Max with Shell gasoline and related products. This agreement also contained an indemnification clause which provided:

11. INDEMNITY—CLAIMS.

11.1 Indemnity. Buyer shall defend and indemnify Shell, its employees and agents, against all claims, suits, liabilities, losses and expenses (including attorneys' fees and other costs of litigation) arising out of any injury, disease or death of persons (including Buyer or Buyer's employees and including injury to personal rights or relations) or damage to property (including Buyer's) caused by or happening in connection with Buyer's loading, transportation, unloading, storage, handling, sale or use of the Products sold hereunder, except when caused (a) by the sole negligence of Shell, its employees or agents, or (b) by defects in the Products not caused or contributed to by any act or omission of Buyer or Buyer's employees or agents. Shell shall have the right, but not the duty, to participate in the defense of any claim or litigation with attorneys of Shell's selection. Buyer's obligation hereunder shall survive any termination of this Contract.

These indemnity provisions are the subject of this action.

On August 15, 1992, an employee of Max, Deborah Lewis, was murdered while working as a cashier in the kiosk at 55 South Broad Street. On February 21, 1994, Ernestine

Slaughter, as administratrix of the estate of Deborah Lewis, brought an action against Shell in the Circuit Court of Mobile County, Alabama ("the *Slaughter* case"). As amended, Slaughter's complaint alleges that Shell negligently or wantonly designed the kiosk, and as a result of such negligence or wantonness, Lewis was killed. Slaughter also alleges that Lewis was killed as a result of Shell's design of the kiosk in violation of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Slaughter further alleges that Shell negligently or wantonly failed to warn Lewis of the unsafe condition of the kiosk on a landlord/tenant/invitee theory. Finally, Slaughter alleges that Max was negligent or wanton and that Shell is liable for Max's conduct as principal in an agency relationship. The *Slaughter* case is still pending in the Circuit Court of Mobile County.

After Slaughter filed her action against Shell, Shell demanded that Max defend and indemnify it pursuant to the indemnification provisions of the above agreements. Max filed the present action seeking a declaratory judgment stating that it is not obligated to defend or indemnify Shell. Shell answered and filed a counterclaim for a declaratory judgment stating that Max is obligated to defend and indemnify Shell. Federated Mutual Insurance Company, Max's insurer, intervened as a plaintiff in this action because of its obligation to pay any judgment against Max. The plaintiff, defendant, and intervenor each filed motions for summary judgment, briefs, and evidentiary submissions. For the reasons stated below, the court finds that Max is obligated to defend and indemnify Shell in the *Slaughter* case.

## B.  Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "al-

ways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. at 2552–53.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## II.  ANALYSIS

The parties do not argue that the indemnity provisions of one of the agreements overrides the indemnity provisions of the other agreement. For example, the court could determine that Max is obligated to defend and indemnify Shell under the Jobber Contract, and that Shell is obligated to defend itself under the Purchase Agreement. Nonetheless, the court does not need to address this issue because it reaches the same result

under both the Jobber Contract and the Purchase Agreement.

## A. The Purchase Agreement Indemnity Provisions

The relevant language of the indemnity clauses in the Purchase Agreement provides that:

> [Max] shall defend, indemnify, and hold harmless Shell ... against all claims, suits, liabilities, judgments, losses, and expenses (including attorneys' fees and costs of litigation) arising out of or in any way relating to or caused by ... (c) any possession, use, operation, or maintenance of the Premises ... which occurs on or subsequent to the Closing Date.

> Shell shall defend, indemnify and hold harmless [Max] ... against all claims, suits, liabilities, judgments, losses, and expenses (including attorneys' fees and costs of litigation) arising out of or in any way relating to or caused by ... (c) any possession, use, operation, or maintenance of the Premises ... which occurred prior to the Closing Date.

It is important to note that Max's duty to indemnify Shell does not depend on the alleged loss for which indemnity is sought being *caused by* possession, use, operation, or maintenance of the premises after the closing date. It applies to any loss "arising out of, *or* in any way relating to *or* caused by" any such possession, etc. Thus, in determining whether Max must defend and indemnify Shell for the claims in the *Slaughter* case, the court must determine whether the *Slaughter* claims arise out of or are in any way related to Max's possession, use, operation, or maintenance of the kiosk subsequent to the sale of the kiosk by Shell to Max. If the claims are so related, then Max must defend and indemnify Shell. However, if the claims arise out of or are in any way related to or caused by Shell's possession, use, operation, or maintenance of the kiosk prior to the sale of the kiosk to Max, then Shell must defend and pay any liabilities itself.

■ Counts I and II of Slaughter's complaint allege that Shell negligently or wantonly designed the kiosk and that such negli-gence or wantonness caused Lewis' death. Shell's actions in designing the kiosk preceded any possession, use, operation, or maintenance of the kiosk by Shell. Moreover, the negligent and wanton design claims do not in any way relate to Shell's possession, use, operation, or maintenance of the kiosk. Lewis was killed while she was employed by Max and while she was working in the kiosk as a cashier. While it is true that the negligent and wanton design claims do not arise out of and were not caused by Max's possession, use, operation, or maintenance, or the kiosk, the claims do in some way relate to Max's possession, use, and operation of the kiosk. Basically, Slaughter's claim is that the design of the kiosk by Shell was defective for the operation and use to which Max was putting the kiosk at the time of the killing. In this way, the claims in Counts I and II, and the loss of life while working in the kiosk, relate to Max's possession, use, and operation of the kiosk.

■ Similarly, Count III of Slaughter's complaint alleges that Shell violated the Alabama Extended Manufacturer's Liability Doctrine. This claim does not in any way relate to Shell's possession, use, operation, or maintenance of the kiosk. Rather, the claim relates to whether the kiosk was "unreasonably dangerous" when sold and as used or operated by Max. Thus, the claim in Count III and the loss alleged therein also relate to Max's possession, use, and operation of the kiosk.

■ Counts IV and V of the complaint in the *Slaughter* case allege that Shell negligently or wantonly failed to warn Lewis of the unsafe condition of the kiosk. These two claims are based on a landlord/tenant/invitee theory. Thus, the claims allege that Shell was the landlord of the kiosk, and Max was the tenant of the kiosk. It is thus clear that the claims relate to Max's possession, use, and operation of the kiosk as an alleged tenant. Moreover, the claims allege that Shell was negligent or wanton in failing to warn Lewis that the kiosk was unsafe as used and operated by Max. The claims do not in any way relate to Shell's possession, use, operation, or maintenance of the kiosk.

■ Counts VI and VII of the complaint in the *Slaughter* case allege that Max was negligent or wanton, and that this negligence or wantonness caused the death of Lewis. The counts further allege that Shell is responsible for Max's actions on an agency basis. Because these claims are clearly based on Max's actions, Counts VI and VII do not in any way relate to Shell's possession, use, operation, or maintenance of the kiosk. Rather, the counts arise out of and relate to Max's possession, use, operation, and/or maintenance of the kiosk.

Therefore, the court finds that all of the claims in the *Slaughter* case relate to Max's possession, use, operation, and/or maintenance of the kiosk subsequent to the date of sale of the kiosk by Shell to Max. Moreover, the court finds that the claims do not in any way relate to Shell's possession, use, operation, or maintenance of the kiosk prior to the date of sale. Thus, the court finds that pursuant to the indemnity provisions in the Purchase Agreement, Max has the obligation and duty to defend and indemnify Shell against the claims in the *Slaughter* case and any liabilities, judgments, expenses, and losses resulting therefrom.

## B. The Jobber Contract Indemnity Provisions

■ The relevant language of the indemnity clause in the Jobber Contract provides that:

> [Max] shall defend and indemnify Shell . . . against all claims, suits, liabilities, losses and expenses (including attorneys' fees and other costs of litigation) arising out of any injury . . . or death of persons (including . . . [Max's] employees . . .) . . . caused by or happening in connection with [Max's] . . . sale . . . of the Products sold hereunder, except when *caused* (a) by the *sole* negligence of Shell, its employees or agents. . . .

(emphasis added). It is undisputed that Slaughter's claims arise out of the injury and death of Lewis, a Max employee, and that the injury and death happened in connection with Max's sale of Shell gasoline.[1] Lewis' death occurred while she was serving as cashier at the gas station owned and operated by Max. This is enough to find that Max is obligated to defend and indemnify Shell against Slaughter's claims and any liabilities resulting therefrom.

However, Max and Federated argue that exception (a) to the indemnity clause applies, and thus that Max is not obligated to defend and indemnify Shell. The exception clause is only applicable if Lewis' injury and death were caused "by the sole negligence of Shell, its agents or employees." This court is not making a determination as to whether Shell was negligent, but assuming that Shell was negligent, Shell's negligence in designing the kiosk or failing to warn Lewis did not, by itself, cause Lewis' injury and death. Such negligence, if any, only contributed to the injury and death of Lewis.

Lewis was murdered by Samuel Ivery while she was working as a cashier in the kiosk at 55 South Broad Street. Ivery robbed the store and decapitated Lewis before fleeing. Since then, Ivery has been convicted of capital murder, and he now sits on Alabama's death row. Ivery's conduct was at least a concurrent cause of Lewis' injury and death. Therefore, Shell's negligence, if any, was not the sole cause of the loss.

■ It is possible that Max and Federated would argue that the word "sole" in exception (a) only means that the exception applies when Max itself is not also negligent with Shell. However, that is not how the exception is worded. "When a contract, by its terms, is plain and free from ambiguity, it *must be enforced as written.*" *American Standard, Inc. v. Goodman Equipment Co.,* 578 So.2d 1083, 1085 (Ala.1991). When the indemnitor's intention to indemnify the indemnitee for its negligence is clear from the words of the contract, "the indemnity provisions will be read and construed so as to give them the meaning the parties have ex-

---

1. The Jobber Contract is clear in providing that it is not the relationship between Slaughter's claims and the sale of the Shell products by Max which obligate Max to defend and indemnify Shell. Rather, it is the relationship between the injury and death of Lewis and the sale of Shell products by Max which obligate Max to defend and indemnify Shell.

pressed." *Eley v. Brunner–Lay Southern Corp.*, 289 Ala. 120, 124, 266 So.2d 276, 280 (1972).

The exception clearly states that Max avoids liability for defense and indemnification only if Shell's negligence was the sole cause of the injury. Any person's concurrent negligence with Shell's negligence, which causes injury or death, prevents application of the exception. It is also clear that if Max and Shell had intended exception (a) to apply only when Max was also negligent, they could have worded the exception to effect their intentions. In fact, some of the language in exception (b), which is not applicable in this action, if included in exception (a) would have given that effect. That language in exception (b) provides: "not caused or contributed to by any act or omission of Buyer or Buyer's employees or agents." Thus, Max and Shell could have worded exception (a) to prevent Max from being liable for defense and indemnification of Shell only when Max itself did not cause or contribute to the death or injury, e.g., "except when caused (a) by the negligence of Shell, its employees or agents; and not contributed to by an act or omission of Buyer or Buyer's employees or agents."

Max's and Federated's argument that this exception applies also would render meaningless the word "sole." Obviously, there is a difference between an exception for injury or death "caused by the sole negligence of Shell," and one which could have been worded "caused by the negligence of Shell." The parties in this case limited the exception to "sole negligence."

The court finds that because Shell's negligence, if any, was not the sole cause of Lewis' injury and death, Max is obligated under the Jobber Contract to defend Shell against all claims in the *Slaughter* case. Moreover, Max is obligated to indemnify Shell against losses, expenses (including attorneys' fees and other costs of litigation), and any resulting liability in connection with the *Slaughter* case.

## III. CONCLUSION

For the reasons stated above, Shell's motion for summary judgment is due to be GRANTED. Max's and Federated's motions for summary judgment are due to be **DENIED.** A separate order and judgment will be entered in accordance with this memorandum opinion.